UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
LUCIEN CHIN,

               Petitioner,

          - against -

HAROLD GRAHAM, SUPERINTENDENT,

             Defendant.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
11-CV-5149 (PKC)

PAMELA K. CHEN, United States District Judge:

Petitioner Lucien Chin ("Petitioner"), appearing *pro se*, seeks a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254, challenging his conviction and sentence entered on July 14, 2006, in the Supreme Court of the State of New York, Nassau County. Following a jury trial, Petitioner was convicted of one count of manslaughter in the first degree, one count of criminal possession of a weapon in the second degree, and one count of criminal possession of a weapon in the third degree. He was sentenced to concurrent terms in prison amounting to twenty-five years' imprisonment with five years of post-release supervision.

Petitioner challenges his conviction on several grounds. For the reasons stated below, the petition for writ of *habeas corpus* is denied.

## BACKGROUND

### I. FACTS

Viewing the facts presented at Petitioner's trial in the light most favorable to the prosecution, *United States v. Riggi*, 541 F.3d 94, 96 (2d Cir. 2008), a reasonable jury could have found the following.

In the spring of 2005, Petitioner and his friends, one of whom was William Sheppard, had a series of altercations with another group of young men who lived in their neighborhood,

including Christopher Grant and Matthew Cunningham. (Trial Tr. ("T.") 407-29, 521-33, 540-60, 703-05, 734-36, 822-24, 845-46, 849-50, 885-96, 910-11, 923-36.) These altercations escalated to threats of violence, violence, and destruction of property, which generated animosity between Sheppard and Petitioner, on the one hand, and Grant and Cunningham, on the other. (*Ibid*.) On at least two occasions, Petitioner expressed an interest in fighting Grant or Cunningham, and, in that context, attempted to obtain a gun from a friend. (T. 407-29, 540-60.)

On July 5, 2005, around 7:00 p.m., Grant, Cunningham, and two of their friends, David Croal and Michael Hamilton, were standing in the front yard of Hamilton's house in Uniondale, New York. (T. 445-50, 613-21.) Sheppard and Petitioner drove by in Sheppard's car, and Petitioner, recognizing Grant and Cunningham, told Sheppard that he wanted to fight Cunningham. (T. 436-45, 476-77, 597-611.)[1] Sheppard and Petitioner then drove to the home of one of their friends, where Petitioner obtained a revolver. (T. 448-49.) Sheppard and Petitioner drove back to Hamilton's house, and Petitioner, from the passenger seat of the vehicle, fired a single shot from the revolver, which struck Hamilton in the chest. (T. 450-53.) Sheppard and Croal both witnessed Petitioner fire the shot. (T. 450-53, 838-39.) Hamilton died from the gunshot wound later that evening in the hospital. (T. 685-86.)

After the shooting, Sheppard and Petitioner fled to Delaware, where they remained in hiding for several days before returning to New York the following week. (T. 457-60, 517-21, 645-52, 1026-38.) During that time, Petitioner told Sheppard's girlfriend, Ashley Armstrong, and one of Sheppard's friends, Roland Knight, that he had shot someone. (T. 993-1025, 1036.) Petitioner was arrested on July 11, 2005, and was indicted for two counts of murder in the second

---

[1] At Petitioner's trial, Sheppard testified on behalf of the government pursuant to a plea deal under which Sheppard received a sentence of three years' imprisonment. (T. 477-677.)

degree, one count of criminal possession of a weapon in the second degree, and one count of criminal possession of a weapon in the third degree.

## II.    PRE-TRIAL RULINGS

The trial court held a *Wade-Dunaway* hearing on March 23, 2006, to determine the admissibility of photo and lineup identifications made by Grant, Croal, and Cunningham, and to determine whether the police had probable cause to arrest Petitioner based on those identifications. (Hr'g Tr. ("H.") 51-53.)  The court denied Petitioner's motion to suppress the identifications and ruled that the witnesses could make in-court identifications of Petitioner at trial and that evidence regarding the lineup identifications would be admissible as well.  (H. 53.)

The trial court also considered Petitioner's pre-trial motion to exclude evidence of Petitioner's prior altercations with Grant and Cunningham in the months leading up to the shooting.  (T. 3.)  The trial court ruled that certain evidence of particular events was barred from admission as improper propensity evidence, but allowed most of the prior-acts evidence into the trial as evidence of Petitioner's motive and to complete the narrative surrounding the shooting. (T. 6-28.)  Specifically, with respect to the prior acts evidence, the trial court ruled that:

> (i) the prosecution could not introduce evidence of a purported fistfight involving Petitioner and Grant that allegedly occurred four months before the shooting, but instead could elicit testimony that Petitioner, Grant, and their respective groups of friends were acquainted with one another and had been in altercations in the past (T. 6-8);

> (ii) the prosecution could introduce partial evidence of an altercation between Petitioner and Grant outside a convenience store on May 8, 2005, including the testimony that Petitioner, after the altercation, placed a phone call to another friend and asked for a "ratchet," which is slang for a gun (T. 14-16); and

> (iii) the prosecution could introduce evidence that, three days before the shooting, Sheppard, Petitioner, Grant, and Cunningham had an altercation outside a fast-food restaurant in Uniondale, during which Sheppard attempted to hit Grant with his car, Grant smashed Sheppard's car window with a hammer, Petitioner smashed a

window of Grant's family's car, and Petitioner placed a phone call to ask another friend for a gun (T. 18-28).

### III.   TRIAL, VERDICT, AND SENTENCING

Petitioner was tried before a jury in an eight-day trial that began on June 28, 2006 and ended on July 12, 2006.  (T. 1, 1319.)  With respect to identifying Petitioner as the shooter, the prosecution's primary witnesses were Sheppard, Grant, Cunningham, and Croal.  (T. 322-26.)  The prosecution also called Ashley Armstrong and Roland Knight to testify about Petitioner's admissions of guilt in the days after the shooting.  (T. 993, 1026.)  Petitioner did not take the stand and did not introduce any evidence in his defense, other than through cross-examination of prosecution witnesses.  (T. 1162, 1168.)

The principal witness against Petitioner was William Sheppard, Petitioner's friend and the driver of the vehicle from which Petitioner purportedly fired the shot that killed Hamilton.  (T. 407-682.)[2]  Sheppard testified extensively concerning the altercations between himself and Petitioner, on one the hand, and Grant and his friends, on the other hand, in the months leading up to the shooting.  (T. 414-30.)  Sheppard also testified about Petitioner's attempts to obtain a gun before the shooting, the shooting itself, and Petitioner's admissions of guilt after the shooting.  (T. 460-678.)  Sheppard unambiguously identified Petitioner as the person who shot Hamilton from the passenger side of Sheppard's vehicle on July 5, 2006.  (T. 450-453.)  In a lengthy cross-examination, Petitioner's counsel impeached Sheppard's testimony on numerous grounds, including by emphasizing inconsistencies in Sheppard's account of the events on different occasions, his record of lying to police officers, his interest in shifting blame for the shooting away

---

[2] As Petitioner's counsel emphasized in cross-examination, Sheppard testified pursuant to a cooperation agreement with the prosecution, under which Sheppard had the opportunity to obtain a lenient sentence of three years' imprisonment for his involvement in Hamilton's death.  (T. 477-677.)

from himself, and his interest in obtaining leniency in exchange for his testimony. (T. 477-677.) In response, Sheppard maintained that, although he had lied previously to police officers in an effort to minimize his own culpability for the shooting, he was giving truthful trial testimony that was not influenced by his prospective plea bargain with the prosecution. (*E.g.*, T. 670-75.)

Testimony from Cunningham, Croal, and Grant also contributed to the case against Petitioner. (T. 322-26.) Cunningham and Grant gave testimony that corroborated, albeit with some discrepancies, Sheppard's description of the escalating tensions in the spring of 2005 between Sheppard and Petitioner, on one side, and Grant and his friends, on the other. (T. 708, 892.) All three men also gave testimony that placed Petitioner in the vehicle from which Hamilton was shot around the time of the shooting. (T. 730, 770, 837-38, 897, 910.) Specifically, although he did not claim to have seen the shooting itself, Cunningham testified that he saw Petitioner in the passenger seat of Sheppard's vehicle ten or fifteen minutes before the shooting, and again just moments before the shooting. (T. 730, 770.) Similarly, Grant testified that, although he did not see the shooting itself, he saw Petitioner in the passenger seat of Sheppard's vehicle around the time of the shooting. (T. 897, 910.) Finally, Croal testified that he was standing near the victim during the shooting, and personally saw Petitioner use a revolver to fire the shot that killed Hamilton from the passenger side of Sheppard's vehicle. (T. 837-38.)

As he had done with Sheppard, Petitioner's counsel impeached the testimony of Grant, Cunningham, and Croal on several grounds, including by pointing to discrepancies in their description of events, prior inconsistent statements, and their failure to identify Petitioner as the shooter in their initial interviews with the police. (T. 733-820, 844-84, 910-64.) In response, Grant, Cunningham, and Croal explained, among other things, that they were initially reluctant to cooperate with the police but ultimately agreed to testify because their friend had died.

(T. 733-820, 844-84, 910-64.)  With respect to Croal in particular, Petitioner's counsel emphasized that Croal was standing about ninety feet away from Petitioner when Croal supposedly recognized Petitioner as the shooter.  (T. 864, 1205.)

The prosecution also presented the testimony of Sheppard's girlfriend, Ashley Armstrong, and one of Sheppard's friends, Roland Knight.  (T. 993, 1026.)  Armstrong testified that, in the days after the shooting, Sheppard and Petitioner fled New York and stayed with her in Delaware, where, according to Armstrong, Petitioner admitted to having shot someone but "wished he didn't hit the wrong person."  (T. 1036.)  Knight testified that, while he was giving Petitioner a ride in his car several days after the shooting, Petitioner told Knight that he had "caught a body," which Knight understood to be slang for killing someone.  (T. 1003.)  On cross-examination, Petitioner's counsel impeached Armstrong's credibility based on a cooperation deal she purportedly received in exchange for her testimony, and impeached both Armstrong and Knight based on their ties to Sheppard, whose plea deal could have been affected by the outcome of the trial against Petitioner. (T. 1008, 1046.)

After the close of the prosecution's case in chief on Tuesday, July 11, 2006, Petitioner chose not to present any evidence.  (T. 1162, 1168.)  The jury was charged and began its deliberations during the afternoon of Wednesday, July 12, 2006.  (T. 1284-1318.)  The next day, July 13, 2006, the jury sent a note to the trial judge, asking for "a measurement of ninety feet". (T. 1323-24.)[3]  In response to that request, the trial court, with the prior agreement of both sides' counsel, told the jury that the length of the courtroom was 60 feet, and that they could "calculate another half of [the] room, add it on and that's 90 feet."  (T. 1324.)

---

[3] The only reference to ninety feet in the trial was in connection with Croal's identification of Petitioner as the shooter.  (T. 864, 1205 (Croal identified Petitioner as the shooter from a distance of approximately ninety feet).)

The jury did not reach a verdict on Thursday, July 13. (T. 1325.) According to Petitioner, after being released for the day, several members of the jury independently measured the distance of ninety feet in an attempt to assess the plausibility of Croal's identification of Petitioner from that distance. (Dkt. 7 (4/18/12 Mem.) at 34-46.) According to Petitioner, during the evening of July 13, 2006, these jurors conducted "tests" of their abilities to identify a person from a distance of 90 feet and then reported their findings to the rest of the jury when deliberations resumed the next morning. (*Id.*) The next day, July 14, 2006, the jury returned a verdict convicting Petitioner of one count of manslaughter in the first degree, one count of criminal possession of a weapon in the second degree, and one count of criminal possession of a weapon in the third degree. (T. 1337-42.)

After the trial, a number of the jurors spoke with both sides' counsel. (Dkt. 7 at 4.) In those conversations, Petitioner's counsel learned about the home experiments conducted by the jury. (*Id.*) Petitioner thereafter filed a motion to set aside the verdict pursuant to N.Y. Crim. P. Law § 330.30, arguing that his conviction should be set aside based on the "misconduct" of those jurors who conducted home experiments to assess the credibility of Croal's ninety-foot identification of Petitioner and then reported the results to the rest of the jury. (Dkt. 7.) Among other things, Petitioner argued that the jurors' misconduct violated his "substantial right to confrontation as well as his ability to cross-examine witnesses and evidence as allowed under the United States Constitution's Sixth Amendment . . . ." (Dkt. 7.) The trial court denied Petitioner's motion, ruling that the juror's conduct was "no more than the application of everyday perceptions and common sense," which "does not taint the subsequent verdict." (Dkt. 7 (quoting *People v. Brown*, 48 N.Y.2d 388 (1979).)

The trial court held a sentencing hearing for Petitioner on December 6, 2006. On the count of manslaughter in the first degree, the court sentenced Petitioner to a determinate term of imprisonment of 25 years with five years of post-release supervision. (Sentencing Tr. 13.) On the count of criminal possession of a weapon in the second degree, the court sentenced Petitioner to a determinate term of imprisonment of 15 years with five years of post-release supervision. (*Id.*) On the count of criminal possession of a weapon in the third degree, the court sentenced Petitioner to a determinate term of imprisonment of seven years with three years of post-release supervision. (*Id.* 13-14.) The court ordered that all of these terms would run concurrently. (*Id.* 14.) Petitioner was also ordered to pay $14,925.07 in restitution by civil judgment. (*Id.*)

## IV.  EXHAUSTION OF STATE REMEDIES

Petitioner appealed his conviction to the Supreme Court of New York, Appellate Division, Second Department ("Appellate Division"). (Dkt. 7.) Petitioner argued that his conviction should be vacated because (i) the trial court improperly admitted Sheppard's testimony concerning Petitioner's out-of-court statements requesting a "ratchet" from a friend (Dkt. 7 (Def.-Appellant's Br.) at 39); (ii) the trial court improperly admitted "other acts" evidence of prior altercations between Sheppard and Petitioner, on the one hand, and Grant and his friends, on the other (*id.* at 39-46); (iii) the "tests" conducted by members of the jury concerning Croal's ninety-foot identification of Petitioner violated Petitioner's constitutional rights (*id.* at 56-61); (iv) the verdict was against the weight of the evidence (*id.* at 62-63); and (v) the trial court failed to give "due consideration" to all facts relevant to Petitioner's sentence of 25 years' imprisonment, which Petitioner argues was overly severe (*id.* at 47-55).

The Appellate Division rejected each of Petitioner's arguments and affirmed his conviction. *New York v. Chin*, 897 N.Y.S.2d 106 (App. Div. 2010). With respect to the other acts

evidence admitted at trial, including Sheppard's testimony about Petitioner trying to get a "ratchet" before the shooting, the Appellate Division held that Petitioner had not preserved his objection for appeal, and, in any event, the admission was unobjectionable because the trial court gave "an appropriate limiting instruction." *Id.* at 107. With respect to Petitioner's weight of the evidence argument, the Appellate Division held that, "although the main prosecution witness . . . had an unsavory and criminal background, and testified pursuant to a cooperation agreement, these facts raised an issue of credibility which the jury resolved in favor of the prosecution." *Id.* The Appellate Division also noted that, "[u]pon reviewing the [trial] record, we are satisfied that the verdict of guilt was not against the weight of the evidence." *Id.* With respect to sentencing, the Appellate Division held that Petitioner's "contention that he was not afforded an opportunity to address the court at the time of his sentencing . . . is unpreserved for appellate review," that "the trial court . . . substantially complied with the statutory [sentencing] requirements," and that "[t]he sentence imposed was not excessive." *Id.* at 108. Finally, with respect to the alleged juror misconduct, the Appellate Division held that Petitioner's rights had not been violated because, "[i]n this regard, the jurors not only made a 'casual observation of a common, everyday experience which was readily available to any of the[m] without the benefit of any special expertise,' but there was additional evidence presented to connect the defendant with the crimes, including, inter alia, the testimony of several eyewitnesses." *Id.* at 107-108.

Thereafter, Petitioner filed an application for discretionary review by the New York Court of Appeals. (Dkt. 7 (3/17/2010 Letter).) In the application, Petitioner asserted the same grounds for vacating his conviction as he had asserted in his submissions to the Appellate Division. (*Id.* at 2-4 (hearsay statements and other-acts evidence), 4-6 (juror misconduct), 7-14 (weight of the evidence), 15-18 (excessive sentence).) By order dated July 21, 2010, the Court of Appeals denied

Petitioner's application for review. *New York v. Chin*, 907 N.Y.S.2d 461 (2010) (Table). Petitioner's 90-day window to seek a writ of certiorari to the Supreme Court of the United States closed on October 19, 2010.

## V. INSTANT PETITION

On October 10, 2011, Petitioner timely filed this petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. (Dkt. 1.) In his petition, Petitioner requests a vacatur of his conviction and a remand to State court for a new trial, or, alternatively, "a hearing to settle any undisputed facts." (Dkt. 1 at ECF 14.)

Petitioner asserts five grounds for *habeas* relief: (i) the trial court improperly admitted Sheppard's testimony concerning Petitioner's out-of-court statements requesting a "ratchet" from a friend (Dkt. 1 at ECF 6; Dkt. 1 (Pet.'s Br.) at 39; Dkt. 7 (4/18/12 Mem.) at 48-56); (ii) the trial court improperly admitted "other acts" evidence of prior altercations between Sheppard and Petitioner, on the one hand, and Grant and his friends, on the other (Dkt. 1 at ECF 8; Dkt. 1 (Pet.'s Br.) at 39-46; Dkt. 7 (4/18/12 Mem.) at 57-66); (iii) the "tests" conducted by several jurors concerning Croal's ninety-foot identification of Petitioner violated Petitioner's rights under the Sixth and Fourteenth Amendments to the U.S. Constitution (Dkt. 1 at ECF 5; Dkt. 1 (Pet.'s Br.) at 56-61; Dkt. 7 (4/18/12 Mem.) at 34-37); (iv) the verdict was against the weight of the evidence (Dkt. 1 at ECF 9; Dkt. 1 (Pet.'s Br.) at 62-63); and (v) the trial court failed to give "due consideration" to all facts relevant to Petitioner's sentence of 25 years' imprisonment, which Petitioner argues was overly severe (Dkt. 1 at ECF 9; Dkt. 1 (Pet.'s Br.) at 47-55).

# DISCUSSION

## I.    EXHAUSTION

As a threshold matter, a prisoner seeking *habeas* relief in federal court must have exhausted his State remedies by "presenting [his] constitutional claims to the state courts in the first instance." *Jackson v. Conway*, 763 F.3d 115, 132 (2d Cir. 2014) (citing 28 U.S.C. § 2254(b)).  "This requires that the prisoner 'fairly present' his constitutional claim to the state courts, which he accomplishes 'by presenting the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it.'"  *Id.* at 133 (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005)).  "While 'a state prisoner is not required to cite chapter and verse of the Constitution in order to satisfy this requirement,' he must tender his claim 'in terms that are likely to alert the state courts to the claim's federal nature.'"  *Id.* (quoting *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011)).

Here, Respondent argues that Petitioner failed to exhaust two of the grounds on which he now seeks *habeas* relief.  First, Respondent argues that Petitioner failed to exhaust his claim that the trial court violated his constitutional rights by failing to give "due consideration" to all facts relevant to Petitioner's sentence of 25 years' imprisonment, which Petitioner argues was overly severe.  (Dkt. 7 (Respondent's Brief ("Resp. Br.")) at 19.)  Second, Respondent argues that Petitioner failed to exhaust his claim that juror misconduct, *i.e.*, the home "tests" conducted by certain jurors, violated Petitioner's rights under the Sixth and Fourteenth Amendments to the U.S. Constitution.  (Dkt. 7 (Resp. Br.) at 8 ("[D]efendant failed to fairly present to the state courts any claim that he might now proffer that the alleged juror misconduct at trial, or the trial court's denial of his motion to set aside the judgment, violated the federal constitution.").)

The Court disagrees on both counts. With respect to sentencing, as previously discussed, Petitioner argued in his submissions to the Appellate Division and the Court of Appeals that the trial court violated Petitioner's constitutional rights by imposing an excessive sentence and failing to give due consideration to all factors relevant to Plaintiff's sentence. (Dkt. 7 (App. Br.) at 47-55; Dkt. 7 (Ct. Appeals Letter) at 15-18.) Although Petitioner did not expressly invoke the Fourteenth or Eighth Amendments to the U.S. Constitution, the substance of his argument and the language he used were clear enough to raise claims of due process and disproportionate and overly severe sentencing that implicate the Fourteenth and Eighth Amendments. (*Ibid*.) Those presentations were sufficient "to alert the state courts to the claim's federal nature." *Jackson v. Conway*, 763 F.3d at 133.

With respect to juror misconduct, Petitioner clearly raised a constitutional issue in State court. In his post-trial motion to set aside the verdict, Petitioner expressly argued that the jury's misconduct violated his "substantial right to confrontation as well as his ability to cross-examine witnesses and evidence as allowed under the United States Constitution's Sixth Amendment . . . ." (Dkt. 7.) In his brief in the Appellate Division, Petitioner argued that the jury's misconduct violated his "right to confront the witnesses against him" and cited decisions by the New York Court of Appeals and the Supreme Court of the United States addressing the scope of a criminal defendant's confrontation rights under the New York and United States Constitutions. (Dkt. 7 (Petitioner's App. Div. Br.) at 58-60 (citing, among other cases, *New York v. Brown*, 423 N.Y.S.2d 461 (1979), and *Sheppard v. Maxwell*, 384 U.S. 333 (1966)).) In his application for review by the Court of Appeals, Petitioner expressly argued that his "right to confront the witnesses against him [was] violated by the tests conducted by the jurors who then 'testified' to the other jurors as to the results," and that the jurors' "tests" also violated "the governing principle . . . that a jury must reach its verdict based

solely on the evidence received in open court and not from outside sources." (Dkt. 7 (3/17/2010 Letter) at 6 (citing *Sheppard v. Maxwell*, 384 U.S. 333 (1966)).) In short, there is no question that Petitioner "fairly presented" his claim of juror misconduct under the Sixth and Fourteenth Amendments to the U.S. Constitution in State court.

## II.    PROCEDURAL BAR

Under 28 U.S.C. § 2254, the Court need not consider the merits of any claim that is procedurally defaulted. *Harrington v. Richter*, 562 U.S. 86, 131 (2011). "A procedural default occurs in one of two ways." *Jackson*, 763 F.3d at 133. First, it occurs when "the state prisoner fails to exhaust his state remedies . . . ." *Id.* Second, it occurs "if the state court's rejection of a federal claim rests on state law grounds—such as the operation of a state procedural rule—that is both independent of the federal question and adequate to support the judgment." *Id.* (quotation omitted); *accord Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("[F]ederal habeas corpus relief does not lie for errors of state law." (quotation omitted)); *Howard v. Walker*, 406 F.3d 114, 121 (2d Cir. 2005) ("A claim that a state conviction was obtained in violation of state law is not cognizable in the federal court."). "The preclusion of federal review applies only when 'the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar.'" *Messiah v. Duncan*, 435 F.3d 186, 195 (2d Cir. 2006) (quoting *Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir. 1996)). In particular, "[w]hen a state court finds that a claim is not preserved, but then holds 'in any event' on the merits, the claim is procedurally defaulted.'" *Kennedy v. Connolly*, 2017 WL 496071, at *12 (E.D.N.Y. Feb. 6, 2017) (citing *Green v. Travis*, 414 F.3d 288, 294 (2d Cir. 2005)).

Here, in affirming Petitioner's conviction, the Appellate Division ruled that Petitioner had failed to preserve two grounds for attacking his conviction. The Appellate Division ruled,

first, that Petitioner had failed to preserve his contention that the trial court erred in failing to give a proper limiting instruction regarding his prior bad acts. *New York v. Chin*, 897 N.Y.S.2d 106, 107 (App. Div. 2010). The Appellate Division ruled, second, that Petitioner had failed to preserve his contention that he should have been given an opportunity to address the court during sentencing. *Id.* Thus, to the extent that the instant Petition is based on either of these grounds, it is dismissed as procedurally barred. *See Connolly*, 2017 WL 496071, at *2. Nonetheless, the Court addresses Petitioner's claims on the merits as well.

## III.   STANDARD OF REVIEW

A federal district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "[F]ederal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (quotation marks omitted); *accord Howard v. Walker*, 406 F.3d 114, 121 (2d Cir. 2005) ("A claim that a state conviction was obtained in violation of state law is not cognizable in federal court.").

If a petitioner's claim was "adjudicated on the merits in State court proceedings,"[4] the district court may grant the petition if the adjudication of the claim:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[4] An "adjudication on the merits" is one that "(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." *Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007) (quotation omitted).

28 U.S.C. § 2254(d).

A State court decision is "contrary to" clearly established federal law if "the state court reached a conclusion of law that directly contradicts a holding of the Supreme Court" or, "when presented with 'facts that are materially indistinguishable from a relevant Supreme Court precedent,'" the State court arrived at an opposite result. *Evans v. Fischer*, 712 F.3d 125, 132 (2d Cir. 2013) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

A State court decision is an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. The Court cautions, however, that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410; *see also Grayton v. Ercole*, 691 F.3d 165, 174 (2d Cir. 2012) ("[T]he writ may only issue where the state court's application of the law was not only wrong, but unreasonable."). A federal *habeas* court may "issue the writ [only] in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Furthermore, "[i]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the substantial and injurious effect standard set forth in *Brecht v. Abrahamson*." *Jackson v. Conway*, 763 F.3d 115, 140 (2d Cir. 2014) (internal brackets and quotation omitted). Under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), "a federal court may overturn a state conviction 'only when the constitutional violation had a substantial and injurious effect or influence in determining the jury's verdict.'" *Jackson*, 763 F.3d at 140 (quoting *Brecht*, 507 U.S. at 637) (internal quotation marks omitted). In this regard, "[t]he strength of the prosecution's case without the erroneously admitted evidence 'is probably the single most critical

factor in determining whether the error was harmless.'" *Id.* To evaluate the importance of the wrongly admitted evidence, a federal court considers "(1) the prosecutor's conduct with respect to the evidence, (2) whether the evidence bore on an issue plainly critical to the jury's decision, and (3) whether the evidence was material to the establishment of the critical fact, or whether it was instead corroborated and cumulative." *Id.*

## IV. ANALYSIS

As noted above, Petitioner asserts five grounds for *habeas* relief. The Court addresses each ground in turn.

### A. Admission of Out-of-Court Statements

Petitioner argues that his right of confrontation under the Sixth Amendment to the U.S. Constitution was violated when the trial court allowed the prosecution to elicit testimony from William Sheppard concerning two phone conversations between Petitioner and third parties, during which Petitioner purportedly asked for a "ratchet," which is slang for a gun. (Dkt. 1 (Pet.'s Br.) at 39.) To the extent Petitioner objects to the admission of his own out-of-court statements concerning his desire to obtain a "ratchet," that objection clearly fails because Petitioner has no right under the Sixth Amendment to confront himself, whatever that would mean. Indeed, Petitioner cites no cases to support his argument that the introduction of a defendant's own out-of-court statements violates the defendant's right of confrontation.[5]

To the extent Petitioner objects to the admission of testimony concerning statements made by persons on the other end of the phone calls with Petitioner, the Court finds that any error in admitting those statements was harmless. Petitioner does not point to anything in the record

---

[5] Under the Federal Rules of Evidence, a party's out-of-court statements may be used against him or her by the opposing party as non-hearsay evidence. *See* Fed. R. Evid. 801(d)(2).

suggesting that the prosecution, defense, or any witness placed any significance on the substance of statements made by the persons who were on the other end of Petitioners' alleged phone calls in which he requested a "ratchet." To the extent those phone calls were relevant to the jury's verdict, they were relevant because of Petitioner's own statements—*i.e.*, his requests for a gun— not because of anything that was said in response to his request. Accordingly, the Court has no trouble finding that any error with respect to admitting testimony about statements made by the recipients of Petitioner's phone calls was harmless under *Brecht*.

### B. Admission of Other Acts Evidence

Petitioner argues that the admission of testimony concerning "other acts" evidence of prior altercations between Sheppard and Petitioner, on the one hand, and Grant and his friends, on the other hand, "deprived [Petitioner] of a fair trial." (Dkt. 1 (Pet.'s Br.) at 57-66.) Petitioner does not explain, however, how the trial court's admission of other acts evidence was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(a). Nor does Petitioner explain how the trial court's admission of the "other acts" evidence "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(a). As Petitioner's brief makes clear, Petitioner's objection to the trial court's admission of other acts evidence amounts to an objection to the trial court's application of New York evidentiary law governing the admission of propensity evidence, including in particular an objection to the trial court's weighing of the probative and prejudicial value of that evidence. (Dkt. 1 (Pet.'s Br.) at 58-66.) Even assuming *arguendo*, as Petitioner contends, that the trial court erred in its application of the New York evidentiary standards governing the admission of other acts evidence, this Court could not grant

*habeas* relief on that basis. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("[F]ederal habeas corpus relief does not lie for errors of state law." (quotation omitted)); *Howard v. Walker*, 406 F.3d 114, 121 (2d Cir. 2005) ("A claim that a state conviction was obtained in violation of state law is not cognizable in federal court.").

### C.      Weight of the Evidence

Petitioner argues that the verdict should be vacated as against the weight of the evidence. (Dkt. 1 at ECF 9; Dkt. 1 (Pet.'s Br.) at 62-63.)

The circumstances in which a federal district court may grant *habeas* relief based on insufficiency of the evidence are extremely narrow. As the Supreme Court recently explained:

> The opinion of the Court in *Jackson v. Virginia*, 443 U.S. 307 (1979), makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

*Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (quoting *Renico v. Lett*, 559 U.S. 766, 772 (2010)). Indeed, the Supreme Court "h[as] made clear that *Jackson* claims[—*i.e.*, *habeas* claims asserting insufficiency of the evidence—] face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference," one layer of deference to the jury, and a second layer of deference to the reviewing State court. *Coleman v. Johnson*, 566 U.S. 650, 650 (2012).

Here, the Appellate Division held that, "although the main prosecution witness . . . had an unsavory and criminal background, and testified pursuant to a cooperation agreement, these facts raised an issue of credibility which the jury resolved in favor of the prosecution." *Chin*, 897 N.Y.S.2d at 107. The Appellate Division also held that, "[u]pon reviewing the [trial] record, we are satisfied that the verdict of guilt was not against the weight of the evidence." *Id.*

As summarized in greater detail above, Sheppard testified that Petitioner obtained a revolver in the minutes before Sheppard and Petitioner drove to Hamilton's house. (T. 448-53.) Sheppard and Croal both testified that they personally witnessed Petitioner fire the shot that killed Hamilton. (T. 450-53, 838-39.) Ashley Armstrong and Roland Knight testified that Petitioner, in the days after the shooting, admitted to having shot someone. (T. 993-1025, 1036.) Even setting aside Croal's identification (discussed in greater detail below), this testimony and the other evidence at trial were more than sufficient basis from which a rational jury could have convicted Petitioner for the murder of Hamilton. As the Appellate Division explained in its order affirming Petitioner's conviction, although the witnesses against Petitioner were subject to questions of credibility, "the jury [evidently] resolved [those questions] in favor of the prosecution." *Chin*, 897 N.Y.S.2d at 107. Given all of the evidence of Petitioner's guilt that was presented at trial, this Court cannot conclude that the Appellate Division's rejection of Petitioner's weight-of-the-evidence challenge was "objectively unreasonable." *Cavazos*, 565 U.S. at 2. Accordingly, the Court denies Petitioner's request for *habeas* relief on this ground.

### D. Juror Misconduct

Petitioner argues that his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution were violated when, after deliberations had already begun, several members of the jury conducted home "experiments" to assess the plausibility of Croal's identification of Petitioner from a distance of ninety feet. (Dkt. 1 at ECF 5; Dkt. 1 (Pet.'s Br.) at 56-61; Dkt. 7 (4/18/12 Mem.) at 34-37.) The trial court rejected the substance of this argument in its order denying Petitioner's post-trial motion to set aside the verdict, holding that no confrontation issue had arisen because the juror's conduct was "no more than the application of everyday perceptions and common sense," which "does not taint the subsequent verdict." (Dkt. 7 (quoting *People v. Brown*, 48

N.Y.2d 388 (1979).) The Appellate Division adopted substantially the same reasoning. *New York v. Chin*, 897 N.Y.S.2d 106, 107-08 (2010).

As noted above, 28 U.S.C. § 2254 authorizes this Court to grant *habeas* relief only where "the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The analysis under § 2254(d)(1) proceeds in two steps. *Jackson v. Conway*, 763 F.3d at 133-34. "The first is to identify the governing 'clearly established Federal law.'" *Id.* (quoting *Marshall v. Rodgers*, 133 S. Ct. 1446, 1449 (2013)). "The second asks whether, in the context of the petitioner's case, the state court's decision was contrary to or an unreasonable application of that clearly established precedent." *Id.*

### 1. "Clearly Established" Federal Law

Petitioner's claim of jury misconduct rests upon the general principle, embodied in the Sixth Amendment to the U.S. Constitution, that "the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Parker v. Gladden*, 385 U.S. 363, 364 (1966)); *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965) (same); *see also* Dkt. 1 (Pet.'s Br.) at 60 (substantially stating this principle). This general principle is clearly established by Supreme Court precedent. *See Parker*, 385 U.S. at 364; *Turner*, 379 U.S. at 473; *Irvin v. Dowd*, 366 U.S. 717, 723 (1961).

### 2. "Contrary to" or "Unreasonable Application of" Clearly Established Law

In the second step of analysis under § 2254, a Petitioner must show that the State court's decision was "contrary to" or an "unreasonable application of" the clearly established principle that was identified in step one.

A State court decision is "contrary to" a clearly established principle if (1) "the state court reached a conclusion of law that directly contradicts a Supreme Court holding," or (2) "the state court arrived at a result opposite to that reached by the Supreme Court when presented with 'facts that are materially indistinguishable from the relevant Supreme Court precedent.'" *Jackson v. Conway*, 763 F.3d at 134 (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Petitioner asserts that the general principle stated above was violated when members of the jury—after deliberations had begun, outside the courtroom and outside the presence of other jurors—conducted their own home "experiments" to determine whether it was possible to identify someone who was in the passenger side of a vehicle from a distance of 90 feet. (Dkt. 1 at ECF 5; Dkt. 1 (Pet.'s Br.) at 56-61; Dkt. 7 (4/18/12 Mem.) at 34-37.) The results of those experiments, Petitioner argues, amounted to testimony from an unsworn witness who was not subject to cross-examination in the courtroom, in violation of Petitioner's confrontation rights under the Sixth Amendment.

Petitioner's argument, which is far from frivolous, is grounded on the general principle that "the evidence developed against a defendant shall come from the witness stand in a public courtroom." At the same time, however, federal law recognizes that a criminal defendant's rights are not violated any time a juror considers information that was not introduced formally at trial, and that, in reaching a verdict, a jury may rely upon "the fund of ordinary experience that [each member of the jury] may bring to the jury room." *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (1994).

Given the tension between these basic tenets of jury deliberation, Petitioner's claim of juror misconduct calls for a closer examination of the general principle on which he relies, namely, that "the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." The Supreme Court cases employing this principle are *Irvin v. Dowd*, 366 U.S. 717 (1961), *Turner v. Louisiana*, 379 U.S. 466 (1965), and *Parker v. Gladden*, 385 U.S. 363 (1966).

In *Irvin v. Dowd*, a prisoner sought *habeas* relief based on a state trial court's denial of his motion to transfer venue away from a community where both the crime and the trial had received extensive media coverage. 366 U.S. at 722. The media coverage included, among other things, details of the crime, the accused's criminal background, purported lineup identifications, a purported lie-detector test, and a purported confession of guilt by the accused. *Id.* at 722-23. In ruling for the prisoner, the Supreme Court held that the trial court's denial of the prisoner's motion to transfer venue—and the juror bias that existed as a result—violated the prisoner's constitutional right to an impartial jury that renders a verdict "based upon the evidence developed at trial." *Id.* at 722. The Supreme Court also noted, however, that "[i]t is not required that the jurors be totally ignorant of the facts and issues involved." *Id.* at 722. Rather, *habeas* relief was appropriate in *Irvin* because of the "clear and convincing" evidence of a "buildup of prejudice" in the community about the prisoner. *Id.* at 722-23; *see also Turner v. Louisiana*, 379 U.S. at 473 (describing *Irvin* as a case in which the Court held that "the conviction could not constitutionally stand because the jury had been infected by prejudice before the actual trial proceedings had commenced").

In *Turner v. Louisiana*, a prisoner sought *habeas* relief based on allegedly improper influence exerted on the jury by two principal witnesses for the prosecution. 379 U.S. at 466-67. The improper

influence arose when the two witnesses, who also happened to be members of law enforcement, were given responsibility for monitoring the sequestration of the very jury before which they would later give testimony. *Id.* Throughout the sequestration, the two law enforcement witnesses were continuously in the company of the jurors; they drove the jurors to restaurants for their meals, ate with them, conversed with them, and even did errands for them. *Id.* at 468. In ruling for the petitioner, the Supreme Court explained that the extensive mingling and communication between the witnesses and the jurors "subvert[ed] the[] [Constitution's] basic guarantee[]" that "the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Id.* at 474.

In *Parker v. Gladden*, a petitioner sought *habeas* relief based on improper statements made by the trial court's bailiff. During trial, before deliberations began, the bailiff told the jury that the petitioner was "a wicked fellow . . .[;] he is guilty." 385 U.S. at 363-64. The Supreme Court held that this statement amounted to testimony against the petitioner, which should have been subject to confrontation and cross-examination by the petitioner. Notably, as in *Turner*, the Supreme Court reaffirmed that, as a constitutional matter, "the evidence developed against a [criminal] defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Id.* at 364.

In this Court's view, the kind of improper jury influence at issue in *Irvin*, *Turner*, and *Parker* is factually distinguishable from the "jury misconduct" that Petitioner alleges in this case. In each of the precedent cases, the jury was exposed to an external influence that was likely to prejudice the jury in its views of the facts that would later be presented at trial. *Irvin*, 366 U.S. at 722-23 (media coverage detailing defendant's criminal history and suggesting his guilt); *Turner*, 379 U.S. at 466-67 (comingling of jury and key witnesses for the prosecution during sequestration); *Parker*, 385 U.S.

at 363-64 (bailiff's assertion to jurors that defendant was "wicked" and "guilty"). None of these cases involved home "experiments" by the jurors to assess the credibility of a witness's testimony. Nor did they involve information that could reasonably be described as part of "the fund of ordinary experience that [each member of the jury] may bring to the jury room[,]" such as a person's ability to identify someone from a distance of 90 feet. *Bibbins*, 21 F.3d at 17. Indeed, in *Irvin*, *Turner*, and *Parker*, the information improperly injected into the jury's deliberations was outside their normal experience and knowledge, and was likely to corrupt or taint the actual evidence introduced at trial.

Given these factual discrepancies, the Court cannot conclude that the State court's denial of Petitioner's motion to set aside the verdict "arrived at a result opposite to that reached by the Supreme Court when presented with 'facts that are materially indistinguishable from the relevant Supreme Court precedent.'" *Jackson v. Conway*, 763 F.3d at 134 (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Having ruled that the State court's decision here was not "contrary to" Supreme Court precedent, the Court considers whether it was an "unreasonable application" of the general principle that "the evidence developed against a defendant shall come from the witness stand in a public courtroom." *Parker v. Gladden*, 385 U.S. 363, 364 (1966)). "In this analysis, a state court's 'unreasonable' application of law is not synonymous with an 'incorrect' or 'erroneous' decision." *Jackson*, 763 F.3d at 135 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). "Instead, the state court's application must be 'objectively unreasonable,' which . . . requires 'some increment of incorrectness beyond error.'" *Id.* (quotation omitted). "If a legal rule is very specific, then the range of reasonable applications of that rule is correspondingly narrow." *Id.* (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "By contrast, 'the more general the rule, the more leeway state courts have in reaching outcomes in case-by-case determinations.'" *Id.* (quoting *Alvarado*,

541 U.S. at 664). "In short, the standard under the unreasonable application prong of § 2254(d)(1) is difficult to meet, and a state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* (quotations omitted).

Taken literally, the principle on which Petitioner relies is a bright-line rule barring the jury from considering any facts that are not introduced at trial. One could argue, therefore, that the "range of reasonable applications of that rule is correspondingly narrow." *Jackson*, 763 F.3d at 135. However, as noted above, given the competing principle that a jury may rely upon "the fund of ordinary experience that [each member of the jury] may bring to the jury room," *Bibbins*, 21 F.3d at 17, the Court does not construe the principle in question literally. *See supra*. Instead, reading the general principle in light of *Irvin*, *Turner*, and *Parker*, the Court views the principle at issue as a more general one, whereby the Constitution is violated when the jury is exposed to an external influence that is likely to prejudice the jury's assessment of the evidence presented at trial or its verdict irrespective of that evidence.

In this regard, the Court takes guidance from the Second Circuit's decisions in *United States ex rel. Owen v. McMann*, 435 F.2d 813 (2d Cir. 1970), and *Bibbins v. Dalsheim*, 21 F.3d 13 (2d Cir. 1994). In *McMann*, the Second Circuit affirmed an order granting *habeas* relief based on a State court's refusal to vacate a verdict where certain members of the jury, who happened to know certain information about the defendant in that case, told other members of the jury in closed deliberations that "the defendant had been in trouble all his life; that he had been suspended from the police force . . .; [and] that he had been involved in a fight in a tavern," among other things. *McMann*, 435 F.2d at 815-16. By contrast, in *Bibbins*, the Second Circuit affirmed an order denying *habeas* relief where the alleged jury misconduct in question was a single juror's statement, in closed deliberations, that no businesses in a particular area

25

of town would have been open at a certain time of day. *Bibbins*, 21 F.3d at 17-18. As the Second Circuit explained in *McMann*, "[t]he touchstone of decision in a case such as we have here is thus not the mere fact of infiltration of some molecules of extra-record matter, with the supposed consequences that the infiltrator becomes a 'witness' and the confrontation clause automatically applies, but the nature of what has been infiltrated and the probability of prejudice." *McMann*, 435 F.2d at 818.

As a technical matter, the Court does not treat *McMann* and *Bibbins* as "refin[ing] or sharpen[ing] a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Jackson*, 763 F.3d at 135 (quoting *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013)) (emphasizing that courts "must scrupulously avoid using [lower court] decisions" in this manner). Rather, the Court views *McMann* and *Bibbins* as confirmation that, although the Supreme Court has established the general principle that a jury's verdict must rest solely on evidence introduced at trial, the touchstone for determining whether an improper external influence or the improper injection of information into the jury's deliberations is "the nature of what has been infiltrated and the probability of prejudice." *McMann*, 435 F.2d at 818. This practical approach is also consistent with the Supreme Court's decisions in *Irvin*, *Turner*, and *Parker*. *See supra.*

Applying this approach here, the Court cannot find that the State court's denial of Petitioner's motion to set aside the verdict based on alleged juror misconduct was "objectively unreasonable," as would be required to grant *habeas* relief. The New York trial and appellate courts both viewed the jurors' alleged home "experiments" as non-prejudicial because they were tantamount to "a casual observation of a common, everyday experience which was readily available to any of them without the benefit of any special expertise." *New York v. Chin*, 897 N.Y.S.2d 106-07 (App. Div. 2010). Regardless of how this Court might resolve the same issue had it arisen in a jury trial in this Court, the Court cannot find that the State courts' resolution of the issue was "objectively unreasonable" under the Supreme Court's relevant

decisions in *Irvin*, *Turner*, and *Parker*. *See Jackson*, 763 F.3d at 135 ("[T]he standard under the unreasonable application prong of § 2254(d)(1) is difficult to meet, and a state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." (quotations omitted)). Accordingly, the Court denies *habeas* relief on the basis of the alleged juror misconduct.[6]

### E.    Sentencing

Petitioner argues that the trial court violated his constitutional rights by issuing a "quick-draw" and overly severe sentence. (Dkt. 1 at ECF 9; Dkt. 1 (Pet.'s Br.) at 47-55.) First, Petitioner argues that the trial court denied him due procedural process, in violation of the Fourteenth Amendment to the U.S. Constitution, by issuing a sentence of 25 years' imprisonment—the maximum authorized sentence—without giving due consideration to the evidence presented at trial and Petitioner's submissions in support of leniency. (Dkt. 1 (Pet.'s Br.) at 47-55.) Second, Petitioner argues that his sentence of 25 years' imprisonment is a sentence so severe that it violates the Eighth Amendment to the U.S. Constitution. (*Id.*)

With respect to Petitioner's due process claim, the Court cannot conclude that the trial court's procedure for sentencing Petitioner gives grounds for *habeas* relief. The trial court entered Petitioner's sentence after a hearing in which the court heard testimony from the victim's mother (who requested the maximum authorized sentence) and Petitioner's counsel. (Sentencing Tr.) The court also considered a pre-sentence report prepared by the probation department, which

---

[6] Though the Court need not reach this issue, even if the Court had found that the jurors' home "experiments" violated Petitioner's Sixth Amendment rights, the Court would still not grant Petitioner *habeas* relief, because any such error was harmless, given the substantial and direct evidence of Petitioner's guilt, without Croal's identification. *Jackson*, 763 F.3d at 140 ("[A] federal court may overturn a state conviction only when the constitutional violation 'had a substantial and injurious effect or influence in determining the jury's verdict.'" (quoting *Brecht*, 507 U.S. at 637)).

Petitioner's counsel had an opportunity to review and argue against during the sentencing hearing. (Sentencing Tr. 7-14.)  Furthermore, Petitioner's counsel expressly told the trial court, during sentencing, that Petitioner would not be speaking at sentencing on his counsel's instructions. (Sentencing Tr. 7.)  Other than the swiftness with which the trial court issued a sentence after Petitioner's counsel made his arguments, Petitioner does not identify any flaw in the procedure used by the trial court to arrive at the imposed sentence, let alone a procedural flaw that satisfies a ground for *habeas* relief under 28 U.S.C. § 2254(a).  The Court, therefore, denies *habeas* relief on this ground.

With respect to Petitioner's Eighth Amendment claim, the Court agrees with the Respondent:  nothing in the Supreme Court's Eighth Amendment case law suggests that a prison term of 25 years for first-degree manslaughter constitutes a penalty so severe as to violate the proportionality requirements of the Eighth Amendment.  (Dkt. 7 (Respondent's Br.).)  Moreover, the Second Circuit has indicated that *habeas* relief cannot be granted based on the length of a prison sentence under the Eighth Amendment where, as here, a State court's sentence falls within the authorized statutory range.  *See White v. Keane*, 969 F.2d 1381, 1383-84 (2d Cir. 1992). Accordingly, the Court also denies *habeas* relief on this ground.

## CONCLUSION

For the reasons set forth above, the Court denies Petitioner's application for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254.  Because Petitioner has not made a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2).  Additionally, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and, therefore, *in forma pauperis*

status is denied for purpose of an appeal.  *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Clerk of Court is respectfully requested to close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: August 29, 2017
      Brooklyn, New York